## MICHIGAN CENT. R. CO. v. SCHAFFER.

### (Circuit Court of Appeals, Sixth Circuit. March 2, 1915.)

### No. 2560.

**1. MASTER AND SERVANT ⬉286—ACTION FOR INJURIES—QUESTIONS FOR JURY.**

Where, in a railway brakeman's action for injuries, there was evidence that a car load of piles, 30 feet long and from 10 to 15 inches in diameter, on a flat car, was loaded in the customary method of loading sawlogs, but there was also evidence that it was not loaded and secured in the customary and recognized way of loading telegraph poles, the piles differed enough from sawlogs and sufficiently resembled telegraph poles to make it a question for the jury whether reasonable care demanded that the load should have been secured in the manner or with some of the precautions generally used with telegraph poles, and evidence as to whether the method adopted was reasonably safe was properly admitted.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. ⬉286.]

**2. EVIDENCE ⬉539½—OPINION EVIDENCE—COMPETENCY OF WITNESSES.**

On the question, in a railway brakeman's action for injuries, as to the proper method of loading timber upon a flat car, witnesses whose experience had been confined to junction point inspection under rules adopted by most railroads, though not by defendant, were competent to testify, as there is no such substantial dissimilarity between the proper standard of safe loading for hauling from the point of shipment and the proper standard for transfer at junction points that one could have no bearing on the other.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2350–2352; Dec. Dig. ⬉539½.]

**3. MASTER AND SERVANT ⬉243—LIABILITY FOR INJURIES—INSPECTION—DUTY OF EMPLOYÉ.**

A rule of a railway company that it was the duty of all train crews to examine stakes, wires, and crosspieces used to secure material loaded on flat cars, before moving cars, did not impose upon each member of the train crew the duty of examining and checking up all the work of the other members, or prevent them from making a suitable and appropriate subdivision of the duties imposed upon the crew among the members thereof, and where the duties had been thus subdivided, and the duty imposed upon the conductor by general custom, and the practice adopted in the particular instance of inspecting such stakes, wires, and

crosspieces, a brakeman's failure to make such inspection himself did not defeat a recovery for injuries caused by the conductor's negligent inspection, especially as any other construction would practically preserve the fellow servant rule, notwithstanding its statutory abrogation.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 682, 759–775; Dec. Dig. ☞243.]

4. MASTER AND SERVANT ☞216—LIABILITY FOR INJURIES—ASSUMPTION OF RISK.

Where a railway brakeman, injured by reason of the improper method in which timber loaded upon a flat car was secured, had never seen timber of that kind loaded and shipped until shipments just preceding the particular shipment, had received no special instructions on the subject, and could not have known of the improper method of twisting the wires securing the load without climbing on the car and repeating an inspection which the conductor had already made, and even then might not have appreciated the danger, he did not in law assume the risk of injury from the conductor's negligence, since, while the common-law defense of assumption of risk is available in actions under Employers' Liability Act April 22, 1908, c. 149, 35 Stat. 65 (Comp. St. 1913, § 8657), to make the defense good in cases depending on the negligence of fellow servants, it must appear that such negligence was in fact known to the injured employé, or was so customary that he should be charged with knowledge, and also that he appreciated or was bound to appreciate the danger.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 567–573; Dec. Dig. ☞216.

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

In Error to the District Court of the United States for the Northern Division of the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Action by Marion F. Schaffer against the Michigan Central Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

W. S. Humphrey, of Saginaw, Mich., for plaintiff in error.
F. W. De Foe, of Bay City, Mich., for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. Schaffer was a brakeman in the railroad's employ upon a logging branch. A car load of piles had been accepted from a shipper on this branch, and while the car was being hauled to the main line the forward end of one pile dropped from the car to the ground, the rear end was driven through the caboose in which Schaffer was riding, and he was hurt. He brought this action under the federal Employers' Liability Act, in the court below, and recovered verdict and judgment.

It is conceded that the duty to load this car properly and safely rested upon the shipper alone, and the sole negligence alleged against the railroad and submitted to the jury was that the conductor of this train failed properly to inspect this car at the time of shipment. That the duty of inspecting and of rejecting any car unsafely loaded did rest upon the railroad is admitted. There have been presented to us only two main questions: First, was there evidence for the jury tending

to show negligence for which the railroad could be liable to Schaffer? and, second, was the injury the result of a risk which Schaffer had assumed?

[1] This car load of material, intended for use as piles, comprised 17 sticks just as cut from the stump, 30 feet long and varying in diameter from 12 to 15 inches at the butt to 10 to 12 inches at what had been the upper end. They were not required to be perfectly straight, and they contained some "sweep." They were pyramided on the flat car; that is to say the bottom tier comprised as many as would lie side by side on the floor of the car, the next tier was one less in number, the sticks lying in the notches between those of the tier below, and so on up. In the sockets provided for that purpose on each side of the car were three stakes 12 to 15 inches high above the car floor. In addition, at the front and rear stakes, a wire was passed from the top of the load down around one stake socket, up across the load and down around the other socket and back to the top, then the free ends were united, and then the double wire was tightened by turning a bar passed underneath and so making a loop around the bar and twisting the loop as much as possible. The specific faults alleged, and upon which the verdict depends, are that the stakes should have been higher, that their tops should have been wired together and with several strands of wire, and that these strands should have been tightened by twisting together like a cable;[1] and it is very likely that if the car had been so treated this accident would not have happened.

The railroad claims—and for the purposes of this review we may consider it established—that this pyramiding was the customary method of loading logs; that it had long been accepted by the employés, including Schaffer, as a proper and safe method, and that the use of any wires or tying was an additional and uncalled-for precaution. On the other hand, there was testimony that, generally, the country over, the customary and recognized way of loading telegraph poles was with the high side stakes and with several cross-wires properly tightened between the stakes. The railroad's whole position that there was no negligence rests on the assumption that the safe loading of these piles is to be judged by the rules applicable to sawlogs. A jury might accept this assumption, but a court cannot do so. This material differed enough from logs and sufficiently resembled telegraph poles, so that it was proper to receive testimony bearing on the question whether the method adopted was reasonably safe, and to leave to the jury the issue whether reasonable care demanded that this load should have been secured in the manner, or at least with some of the further precautions, generally used with the smaller product.

[2] From this conclusion, it follows that witnesses were competent to testify, even though their experience had been confined to junction

[1] A plausible theory of the accident—and one which we may assume the jury accepted—seems to be that the wire was weakened by twisting the loop, that it broke at this point, that as the front end of the stick worked out of position the wire slipped around one of the stake sockets for a distance and then caught, thus holding the end of this pile from falling further, and that the engagement with the socket then gave way, letting the wire slip further, and the end of the pile fall to the ground.

point inspection under the rules of the Master Car Builders' Association, adopted by most of the railroads, but not by defendant. Between the proper standard of safe loading for hauling from the point of shipment and the proper standard for transfer at junction points there can be no such substantial dissimilarity that one can have no bearing on the other. Even if the liability was to be wholly fixed by defendant's rules relating to logs, as defendant claims, there would still be evidence tending to show improper inspection, because these rules required side stakes extending 24 inches above the car floor, and the stakes actually used extended up not over 16 inches. It is at least probable that a 24-inch stake would have prevented any serious injury following the breaking of the wire.

[3] One of the defendant's rules on this subject provided:

"It is the duty of all train crews to examine such stakes, wires, and crosspieces before moving cars, whether the same have been loaded by the shipper or by the company; and should it appear that such stakes, wires, or crosspieces are insufficient, or not in good order, they are instructed to decline to remove the cars until the proper safeguards for securing the freight shall have been furnished."

This train crew consisted of the engineer, fireman, and two brakemen —of whom plaintiff was one. It is defendant's theory that the duty of inspection was, by this rule, so far imposed on plaintiff as to prevent any recovery by him because of a negligent inspection; while it is plaintiff's theory, submitted by the court to the jury and by the verdict impliedly adopted, that by the long-continued general custom, and by the practice adopted in this instance, the duty had been turned over to the conductor, so that the company's negligence could be rested solely on the conduct of the conductor, and so that any carelessness by the brakeman would be, at the worst, contributory negligence. It seems obvious that this rule cannot be interpreted according to its extreme literal force, as imposing the duty equally on each member of the crew. It is not to be supposed that the engineer and fireman were expected to leave their positions and inspect loading; nor is it reasonable to think that each brakeman must examine and check up all the work of the other brakemen and of the conductor, or else be himself guilty of a breach of duty which would amount to participation in the others' negligence.

We think these rules contemplate that the crew should make suitable and appropriate subdivision among its members of the duties imposed upon that body; and observing that, by other rules, the conductor is declared to be responsible for the care and safety of the train and "must know that train has been inspected before starting," and that two different bulletins regulating inspection of such cars are addressed to freight conductors, it was entirely permissible for the jury to find that the duties had been thus subdivided, that the rule had been interpreted and applied according to plaintiff's theory, and that the failure of proper inspection might be chargeable to the conductor, and not to plaintiff. Indeed, the other construction would, in practical effect and pro tanto, preserve the fellow servant rule, in the face of its statutory abrogation.

[4] Upon the subject of assumption of risk, no question is open, save whether the undisputed testimony showed such a risk assumption as required the direction of a verdict for defendant. Such assignments of error as complain of the charge given by the court on its own motion on this subject rest upon no exception taken, and cannot be considered. Those which complain of the modifications made by the court of the charges on this subject requested by defendant rest on no exception pointing out any particular in which the modification was inaccurate or incomplete, and so there is only the question whether it was error to refuse the requests as presented. By Seaboard Air Line v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, it is now settled that the common-law defense of assumption of risk remains in actions brought under this statute, but it is also recognized by recent decisions in this court (Yazoo v. Wright, 207 Fed. 281, 285, 125 C. C. A. 25, affirmed 235 U. S. 376, 35 Sup. Ct. 130, 59 L. Ed. ——; Tennessee Co. v. Caddy, 207 Fed. 297, 298, 125 C. C. A. 41; Illinois Co. v. Porter, 207 Fed. 311, 314, 125 C. C. A. 55; Sterling Co. v. Hamel, 207 Fed. 300, 304, 125 C. C. A. 44) that to make the defense good, in cases depending on the negligence of fellow servants, it must appear, first, that the negligence was either in fact known to plaintiff, or was so customary that he must be charged with knowledge, and, second, that he must appreciate, or be bound to appreciate, the danger.

Both these elements are left out of sight in the claim that a verdict should have been instructed against Schaffer. Until the just preceding shipments of this same consignment, he had never seen piling loaded or shipped. He had received no special instructions from any one on the subject. He had no reason to think that his conductor had carelessly accepted an unsafe tying. Unless he climbed on the cars and repeated the inspection which the conductor had already made, he would not know of the use of that method of twisting the wires which very probably was the fatal error; and if he had seen all the details of the fastening, it could not be said, as matter of law, that he either did or was bound to appreciate the danger which, as the event proved, attended this method of loading and tying this particular material.

The judgment below is affirmed, with costs.