WILLIAM G. MOREY *vs.* MAINE CENTRAL RAILROAD COMPANY.

Androscoggin.    Opinion April 29, 1926.

*When a workman contracts to perform dangerous work, or to work in a dangerous place, he contracts with reference to that danger and assumes the open and obvious risks incident to the work, or as sometimes expressed, such dangers as are normally and necessarily incident to the occupation.    This is a contractual assumption of risk.*

*With reference to risks and dangers covered by the contract, the employer owes the employee no duty, and so cannot be held guilty of negligence.*

*A primary duty of a railroad company is to use due care in providing a reasonably safe place and reasonably safe appliances for the use of its employees.    It does not undertake to provide a reasonably safe place and reasonably safe appliances, but it does undertake to use due care to do so, and that is the measure of its duty.*

*An employee has a right to assume that the railroad company will perform its duty, and his contractual assumption of risk does not cover risks arising from his employer's negligence in failing to perform its duty.*

*There may be a voluntary assumption, by the workman, of risks arising from the failure of the employer to perform his duty, and this occurs when the workman becomes aware of them, or they are so plainly to be seen that he must be presumed to have known and appreciated them.*

*Negligence of the employer being established, voluntary assumption of the risks arising therefrom must be proved by the defendant, if he would avoid the consequences of his negligence.*

In the instant case there is no claim of negligence, in not giving warning of danger. The danger was obvious.    There is no duty to warn or instruct a competent and experienced employee as to obvious dangers connected with his work.

Without attempting a statement, comprehensive of all cases, involving other elements and conditions, it must be held that, as to car-loading, the contract of employment of a brakeman on a freight train includes the assumption of all obvious, unconcealed dangers incident to operation of trains of cars loaded in accordance with rules of the railroad company designed to accomplish efficient transportation with reasonable safety for the employees, the property in transit and the roadbed and equipment in use.

The plaintiff's lack of observation of surrounding conditions plainly observable to a man of his age, intelligence and adequate experience cannot establish or enlarge the master's liability.

The risk which resulted in the plaintiff's injury was assumed in the contract of employment;  the defendant was not negligent in accepting for transportation the car of lumber on which the accident occurred, loaded in conformity to its rules.

But, whether the decision is based upon a contractual assumption of risk, or upon a voluntary assumption of a risk caused by negligence in accepting for transportation the car of lumber piled as shown in this case, the verdict is clearly wrong.

On general motion for new trial by defendant. An action to recover damages for personal injuries suffered by plaintiff while in the employ of defendant as a brakeman on one of its freight trains. In passing over the tops of the cars, the train being in motion, in going to the cab in the locomotive, the plaintiff had to pass over two cars loaded with lumber, and in passing from one lumber ladened car to the second he slipped and fell between the cars and his left leg was severed from his body. Plaintiff alleged negligence on the part of defendant in not using due care in providing a reasonably safe place in which to work and reasonably safe appliances. The general issue was pleaded and under a brief statement assumption of risk and contributory negligence was set up. A verdict of $15,000.00 was rendered for plaintiff and defendant filed a general motion for a new trial. Motion sustained. New trial granted.

The case is very fully stated in the opinion.

*Herbert E. Locke,* for plaintiff.

*Charles B. Carter,* for defendant.

SITTING: WILSON, C. J., PHILBROOK, MORRILL, STURGIS, BASSETT, JJ.

MORRILL, J. On February 2, 1924, the plaintiff while employed by the defendant as a brakeman upon a train engaged in interstate commerce, fell from a moving train and received an injury which resulted in the amputation of his left leg above the knee. In this action to recover damages for that injury, brought under the Federal Employers' Liability Act, the plaintiff has a verdict, and the case is before us upon a general motion for a new trial.

The accident happened on a flat car loaded with lumber. The plaintiff alleges (1) "failure of the defendant to provide the plaintiff a safe place in which to work, (2) the failure of the defendant to provide reasonably proper and necessary safety appliances and arrangements, and (3) the negligence of the defendant in requiring the plaintiff to proceed in his work over and upon a car so piled with lumber and accepted for shipment by the defendant so piled with

lumber that it was impossible for a man with safety to cross the same."
Failure to comply with the Federal Acts for the use of safety appliances is not claimed and was expressly disavowed by counsel; the allegation (2) of failure to provide reasonably proper and necessary safety appliances and arrangements refers to alleged failure to provide a "ladder or other device for him to climb down from said pile of lumber."

The above are the only allegations of negligence to which the injury is attributed.

The defendant pleaded the general issue, and by way of brief statement, (1) that at the time of the accident the plaintiff was engaged in the movement of interstate commerce, and was within the Federal Employers' Liability Act (which is conceded), (2) "that the alleged injury was received as the outflow of a danger inherent to and a part of the said plaintiff's contract of employment, and that the risk of such danger was assumed by the said plaintiff, and (3) that the negligence of the plaintiff is indicated by such acts of his that make his negligence the sole cause of the accident or if not, that the acts of the plaintiff contributed largely to the causation of the accident."

After an accident resulting in such serious injury as here occurred, human sympathy for the injured man is strongly aroused, and we must need recall the familiar principle, that the mere fact of the accident carries with it no presumption of negligence on the part of the employer; that the employer's negligence is an affirmative fact to be established by the injured employee.

Nor does the fact that the work performed is dangerous, or is performed in a dangerous place, and injury results, necessarily show negligence. Dangerous work must be performed; and work must be done in dangerous places; and when a workman makes a contract to do such work, or to work in a dangerous place, he contracts with reference to that danger and assumes the "open and obvious risks incident to the work," or as sometimes expressed, "such dangers as are normally and necessarily incident to the occupation." This is a contractual assumption of risk. *Ashton* v. *B. & M. R. R.*, 222 Mass., 65, 69. *Seaboard A. L. Co.* v. *Horton*, 233 U. S., 492, 504; 58 L. Ed., 1062, 1070. With reference to risks and dangers covered by the contract, the employer owes the employee no duty, and so cannot be held guilty of negligence. *Ashton* v. *B. & M. R. R.*, supra. *Murch* v. *Wilson's Sons Co.*, 168 Mass., 408, 411.

A primary duty of a railroad company is to use due care in providing a reasonably safe place and reasonably safe appliances for the use of its employees. It does not undertake to provide a reasonably safe place and reasonably safe appliances, but it does undertake to use due care to do so, and that is the measure of its duty. (*Sheaf* v. *Huff*, 119 Maine, 469). The rule of the defendant, much relied upon by plaintiff that "no car must go forward which exceeds the clearance dimensions or is loaded in a manner to make it unsafe," does not enlarge the legal duty of defendant; it was an injunction to employees to observe the legal duty resting upon the defendant. An employee has a right to assume that the railroad company will perform its duty, and his contractual assumption of risk does not cover risks arising from his employer's negligence in failing to perform its duty. *P. & R. Ry. Co.* v. *Marland*, 239 Fed. 1, 7.

But there may be a voluntary assumption, by the workman, of risks arising from the failure of the employer to perform his duty, and this occurs when the workman becomes aware of them, or they are so plainly to be seen that he must be presumed to have known and appreciated them. *Ashton* v. *B. & M. R. R.*, supra. *P. & R. Ry.* v. *Marland*, supra. *Cin., N. O. & T. P. Ry. Co.* v. *Thompson*, 236 Fed. 1. Negligence of the employer being established, voluntary assumption of the risks arising therefrom must be proved by the defendant, if he would avoid the consequences of his negligence. *Ashton* v. *B. & M. R. R.*, supra.

Cases between employer and employee to recover damages for injuries received during employment, where the question of assumption of risk is involved, fall into one or the other of these classes.

The questions presented to the Law Court are whether upon the evidence the jury was warranted in finding, as they must have found, (1) that there was no contractual assumption of risk, (2) that there was no voluntary assumption of risk, and (3) that the injury was not caused solely by the plaintiff's negligence; in the last analysis the first two issues involve the finding that the defendant was negligent in accepting for transportation a car of lumber loaded in conformity to its rules, as the car in question was.

There is very little, if any, dispute as to the material facts. The plaintiff is a young man, twenty-eight years of age, six feet tall, weighing one hundred and eighty-eight pounds, who had been employed by defendant as a brakeman since May, 1923; he was head

brakeman in a "ring crew" operating extra freight trains between Waterville and Bangor; he was expecting to take his examination for a flagman's position in the near future; he appears to have been alert, familiar with his duties as head brakeman, and efficient, a fine type of employee.

The train crew left Waterville at 1:30 A. M., on the day of the accident, and arrived at Northern Maine Junction at 6:00 A. M.; the train West was already made up, consisting of forty-six loaded cars, and with the same engine left on the return trip at 7:45 A. M. The morning was fair, the thermometer at 19° above zero at seven o'clock. In this train were four flat cars of lumber, near the forward end of the train, with one or two box cars between them and the tender. The last of these lumber cars designated as "B. & A. No. 70131," on which the accident happened, was a fully loaded car, the fifth or sixth car from the tender; in front of it was a partially loaded flat car of lumber; behind it was a box car.

All the lumber referred to, loaded on two cars of different destinations, was tendered by the Bangor & Aroostook Railroad Company to the defendant on January 30; the cars were rejected because loaded in excess of the prescribed maximum weight; the Bangor & Aroostook Railroad Company reduced the load on each car to the maximum load by removing lumber from the top; the lumber so removed was loaded on other cars. The reloaded cars were again offered to defendant on February 1, and accepted. The photographs of the cars taken upon arrival of the train at Waterville show that car B. & A. No. 70131 was a carload of mixed lumber; the lower part of the load was joist; above the joist were boards; lumber upon the car next in front, removed from the car in the rear, appears to be narrow boards, some tied in bundles.

After the engine was coupled to the train at Northern Maine Junction, the plaintiff went along the side of the train inspecting the brakes and air hose, letting off the brakes, coupling the air hose, where necessary, and looking for air leaks; in performing this duty he passed the lumber cars four times; he then went forward to the engine. His place of duty was near the head of the train; when entering or leaving double track, or passing over a railroad crossing, or passing yard limits, it was his duty to be on top of the moving train; he must also be in a position, on the ground or on the train, to relay signals from the conductor to the engineer. It was customary for the head

brakeman to ride in the engine cab; no printed rule of the road required it, nor was he ordered to do so. When the train left Northern Maine Junction the plaintiff was on the engine.

The first stop was at Newport for water, twenty-one miles from Northern Maine Junction; where the plaintiff was during this stop does not appear; he was on the engine when the train started from Newport. As the conductor swung aboard the caboose on the moving train, before it had cleared the Newport yard, his way bills dropped from his pocket; he applied the air brakes, and as the train stopped, the plaintiff left the cab, went back on the ground, and climbed to the top of a car two or three cars in the rear of the lumber cars, where he could relay the starting signal of the conductor. Having relayed the signal he started forward over the tops of the cars; he was not ordered to do so; there was no rule requiring him to go forward over the tops of the cars; such a rule manifestly would be unworkable, considering the different classes of cars making up an ordinary freight train and their varied loads; nor was there any rule or order forbidding him to go forward over the tops of the cars while the train was in motion; it is common knowledge that trainmen frequently, as occasions require, go over the tops of freight cars while the train is in motion. When he came to the forward end of the box car next behind the last lumber car, he had no difficulty in passing from the box car to the top of the lumber, which was some three feet lower than the running board on top of the box car. As he came to the forward end of the lumber car the accident occurred; no person saw it, and we quote the plaintiff's description of the occurrence:

"Q. Will you go on and tell the jury what you did from the time you reached the end of that car of lumber?

"A. As I got to the end of this car of lumber, this high car, I see it was quite difficult to go down over it, so I kneeled down and got down, swung around my hands on top of this lumber and tried to crawl down step by step over the edge of this lumber; and as I worked myself down, as I remember there was some snow on the edge of these boards and I slipped, lost my balance and fell backwards. As I fell I got hold of this brake here, tried to save myself; and the brake wasn't in good conditon as it should have—

"Q. Leave that out.

"Mr. CARTER: I object.

"Mr. LOCKE: That may be stricken out. You may tell about the brake but don't comment on what you—

"A. The brake, as I grabbed hold of it, it was loose—there was a play in it, and as I grabbed hold of it, instead of holding it pushed forward—it wasn't firm—and, of course, I lost my balance and fell off the car."

Again, still on direct examination:

"Q. I show you chalks marked Plf. Exhs. Nos. 1-4 on which you will note I have marked X at the top of the pile of lumber, and ask you whether or not the end of the car marked X is where your accident occurred?

"A. Yes.

"Mr. CARTER: Mr. Morey answered something to you in a whisper.

"Q. He said, 'Yes, I fell down right here.'

"A. I just wanted the cross where I tried to get down.

"Q. Now, I want you to describe a little more carefully how you attempted to lower yourself down over this car. Which way did you face, in the first place? Did you face toward the car you were getting down over or toward the car in front of you?

"A. When I was walking along before I started to get down I was facing the next car of lumber, but I turned around in trying to get down and kneeled down and put my hands on top of the car there where the X is on the lumber and lowered myself down and worked myself down on hands and feet, stepping down gradually.

"Q. In doing that were you facing toward—

"A. I was.

"Q. Were you facing toward the car you were on?

"A. Yes, sir.

"Q. You turned and faced toward the car you were on?

"A. Yes, sir.

"Q. Tried to lower yourself down over the side?

"A. Yes, sir."

He repeated his remembrance of the accident several times in answer to his counsel substantially as above, and on cross-examination he said:

"Q. When you started to come down how were you facing?

"A. I got all mixed up with that. I figured the other way.

"The COURT: There is a higher load of lumber, is there, one you were on?

"A.   Yes.

"The COURT: Were you headed right towards that car where the higher load was or—

"A.   Then according to that my back would be to the engine, coming down this way.

"The COURT: You were sort of backing down?

"A.   My back would be to the engine.

"Q.   You sort of got down on your hands and knees?

"A.   Yes, I tried to work down.

"Q.   With your back to the engine?

"A.   Yes, sir.

"The COURT: That is the way I understood it in the original explanation."


"Q.   When you made a grab for that brake wheel did you have to reach down or was it right about even?

"A.   I don't just remember.   As near as I remember I reached out to grab it to save myself and when I grabbed hold of it, it was such a play in it it went over to that cant.

"Q.   What did you grab, the staff or the wheel?

"A.   I grabbed the wheel, and I didn't get a grip on it.   I kind of hit it and it was loose and it went over to the right, right away from me.

"Q.   In other words, when you started falling you didn't touch the wheel until after you had lost your footing and was falling?

"A.   Yes, when I was falling.

"Q.   You had gone?

"A.   Well, I was going.

"Q   You had gone.   If you had grabbed the wheel and held on—

"A.   If I had got to the wheel I would have been all right.

"Q.   If you had grabbed the wheel and saved yourself you would have been all right?

"A.   Yes.

"Q.   You had lost control of yourself?

"A.   Yes.

"Q. You had slipped, had taken your hands off the load, and you had gone, and in falling down by you saw the wheel and made a grab for it and missed it?

"A. Yes, sir."

The testimony as reported gives a very inadequate conception of the manner in which the lumber was loaded on the car. The photographs before referred to, made a part of the case, clearly show the situation; the cross on No. 4 shows clearly where the plaintiff attempted to come down, near the brake; No. 1 shows the side of the load.

As already stated, this car was loaded with mixed lumber, the joist being at the bottom of the load, the boards on top. The height of the load was six and one half feet above the floor of the car, by actual measurement; the height of the floor above the top of the rail is estimated at forty-three inches; the height of the running board on top of the box car, next back of the car of lumber was thirteen feet two and one half inches above the top of the rail; allowing for the slight difference in height, above the rail, of the floors of the box car and the flat car, the top of the load of lumber was about three feet lower than the running board of the car in the rear. This is well shown in photograph No. 3. The plaintiff had no difficulty in "stepping" from the higher car to the lower, although his memory is evidently not very clear as to it. .

The car of lumber, B. & A. No. 70131, was put into the train with the brake end towards the engine; the brake shaft was to the right, looking forward, of the center of the car, and thirty inches from the right hand side of the car; the brake wheel was twenty-six inches above the platform of the car, and sixteen inches in diameter; the brake shaft above the sill was one and one quarter inches in diameter. The brake when inspected upon arrival of the train at Waterville was found in good condition; the shaft was not bent, and had no greater play with the brakes released than is necessary. The plaintiff is mistaken when he gives the impression that the brake shaft swung away from him when he attempted to grasp the wheel as he fell; the brake wheel and shaft may have turned in the socket, the brakes being released; but the appliance was unquestionably in good condition; and as before noted there is no allegation that it was defective.

After the overload had been removed by the Bangor & Aroostook Railroad Company's men, the car when received for transportation

by the defendant was loaded in conformity with the rules of the defendant road. It was properly staked; the load was properly bound with wire, and supplied with the requisite number of binders or crosspieces. The shorter lumber was piled on the right-hand side of the car looking forward, to leave the prescribed clearance around the brake wheel; on the left-hand side the long lumber was piled, but did not overhang the end of the car, in compliance with the rules. On the top of the load for the entire width of the car longer boards were piled, extending forward substantially to the end of the car, and over the clearance space around the brake wheel. Looking at the photograph No. 4 showing the side of the loaded car the manner of loading is clearly seen. Next to the stakes the joist was placed on edge, and next above the eighth joist, thirty-two inches above the floor of the car, a binder was inserted, the end of which projected from the side of the car at least the thickness of the stake, four inches; this point was forty-six inches below the top of the load; on the left-hand side of the front end of the car a ledge is clearly to be seen where the longer joist projected forward. Next above the lower binder are four joist on edge, the top of which was forty-eight inches from the floor, and thirty inches from the top of the load. At this point, three inches, or the thickness of a joist, in from the side of the load, another ledge made by a joist longer than the boards above it, may be seen. Above the joist, next to the stakes are twenty boards, apparently narrow and tied in bundles; on top of these boards is the second binder; above the second binder the longer boards were loaded, ten of them next to the stake, apparently tied in two bundles. Assuming that the boards were one inch in thickness, and the binders of the same thickness, the top of the upper binder was seventy inches above the floor of the car, and the layer of long boards was ten inches thick, giving a total height of load of eighty inches, against seventy-eight inches by actual measurement; probably the boards were not quite one inch thick.

To the left of the brake wheel, eight inches above it and forty-four inches below the top of the load was a projecting stick; and at the right forward corner of the car were other projecting sticks. The stakes projected above the top of the load.

It must be remembered that the plaintiff was not, under the circumstances, obliged to go over the boards in order to reach the engine. The train, a heavy one, had just started on an up grade and

on a curve, and it would take several minutes for it to gain much speed. The plaintiff could have descended to the ground by the ladder on the box car, and run forward. He had the choice.

Upon this examination of the case, we are of the opinion that the defendant was not negligent in accepting for transportation this car loaded in conformity to its rules; that the risk which resulted in Mr. Morey's injury was assumed in the contract of employment, and that the defendant was not wanting in due care to provide a reasonably safe place in which the plaintiff should do the work for which he was employed.

That the situation was dangerous may be conceded. So is any duty of a brakeman dangerous; it was dangerous for Mr. Morey to jump from the top of the box car over the drawbars to the load of lumber three feet below; so it is dangerous to pass from one car to another while the train is in motion; but a brakeman assumes such risks, and the employer's liability is not to be guaged by the employee's good or ill fortune in working in the face of danger,—by Mr. Morey's misfortune, or by the good fortune of the man who took his place on the run, in successfully going down by stepping on the brake-wheel.

There is no claim of negligence in this case, in not giving warning of the danger,—no allegation of that kind in the declaration. The danger was obvious. There is no duty to warn or instruct a competent and experienced employee as to obvious dangers connected with his work. *Kelly* v. *Boston El. Ry.*, 214 Mass., 461-2. *Brosseau* v. *Edward J. Cross Co.*, 215 Mass., 541-2. *Amero* v. *Adams et als.*, 217 Mass., 367-8. In that respect the case differs from *Portland Terminal Co.* v. *Jarvis*, 227 Fed., 8, strongly relied upon by plaintiff, in which the negligence charged was in not giving warning of an unusually low bridge, so low that the injured man on an unusually high car, having thrown himself flat on the roof when warned by the "tell tales," was swept from the car. So in *Norton* v. *Railroad Co.*, 116 Maine, 147, the alleged negligence was in failing to warn the plaintiff of the unusual construction of a bridge at which the plaintiff was injured in the night time.

Nor is this a case in which a risk assumed by the contract of employment was changed and increased by an intervening negligent act of a co-employee, which the injured man might not anticipate and the danger from which he might not have appreciated. *C. & O. R. R. Co.* v. *DeAtley*, 241 U. S., 310, 314; 60 L. Ed., 1016, 1020.

Nor is this a case where a load was improperly loaded and wired, and a brakeman was injured by a part of the load falling from the car while in transit. *Mich. Cent. R. Co.* v. *Schaffer*, 220 Fed., 809.

Without attempting a statement, comprehensive of all cases involving other elements and conditions, we think that it must be held that, as to car-loading, the contract of employment of a brakeman on a freight train includes the assumption of all obvious, unconcealed dangers incident to operation of trains of cars loaded in accordance with rules of the railroad company designed to accomplish efficient transportation with reasonable safety for the employees, the property in transit, and the roadbed and equipment in use. The employment is "necessarily fraught with danger to the workman—danger that must be and is confronted in the line of his duty. Such dangers as are normally and necessarily incident to the occupation are presumably taken into account in fixing the rate of wages." *Seaboard A. L. Ry. Co.* v. *Horton*, 233 U. S., 492, 504; 58 L. Ed., 1062, 1070. In the course of his work the brakeman may have occasion to go over the tops of trains in motion, passing from car to car, the danger in each case being increased or lessened with the type of car and kind of load. He must be presumed to be acquainted with the rules; at least he is entitled to assume that the cars will be loaded in conformity to the rules; it is established that the car in question was so loaded.

That the danger here was obvious is indisputable. The plaintiff only says that he did not observe the car, yet he passed it four times before the car left Northern Maine Junction and once as he went down the train before climbing to the top of the cars, all in broad daylight. He must be chargeable with knowledge of the conditions, which were plainly observable. His lack of observation of surrounding conditions plainly observable to a man of his age, intelligence and adequate experience cannot establish or enlarge the master's liability. *Brousseau* v. *Edward J. Cross Co.*, 215 Mass., 541. *Gleason* v. *Smith*, 172 Mass., 50. *Walsh* v. *Dairying Assoc.*, 223 Mass., 388.

The operating rules of a railroad are the result of experience; they are of general application, and are intended to establish a standard for the operation of the road consistent with its duty to the public; an employee engaged in operating the railroad must be held to contract with reference to them; they enter into the contract and govern the legal relation of the parties, when they are observed as well as when they are disregarded. It is not claimed and nothing appears to show that the operating rules were not reasonably effective for the safety of the employees.

These cars of lumber were tendered to the defendant by a connecting carrier at Northern Maine Junction for transportation to Massachusetts points, beyond the defendant's road, loaded while on the connecting road in conformity to defendant's rules. A ruling directing a verdict for defendant, on the ground of a contractual assumption of risk, would have been sound as a matter of law; on that ground we prefer to place the decision.

But, whether the decision is placed upon the ground of a contractual assumption of risk, or of a voluntary assumption of a risk caused by negligence in accepting the car of lumber so piled, the verdict is clearly wrong. The plaintiff was "manifestly confronted with all the difficulties and dangers to be encountered in reaching his place on the engine. It would be fatuous to say he was not aware of them, and it would be an impeachment of the mental capacity of a competent man to say that he did not appreciate them." *Briggs* v. *U. P. Ry. Co.* (Kan.), 175 Pac., 105.

It is undoubtedly true, as remarked by Mr. Justice Moody in *Butler* v. *Frazee,* 211 U. S., 459, 466, 53 L. Ed., 281, 285, that the complicated conditions of modern industry and the imperative need of employment have created a strong influence against the application of the rule of assumption of risk, "as shown by the notorious unwillingness of juries to apply the rule, and by the legislative modifications of it which from time to time have been made, as, for instance, by Congress in the safety appliance law." But the rule prevails, and where it is relevant, we must apply it however great our sympathy for the injured employee. To sustain a verdict in this case would go far toward making a railroad company liable to its trainmen for all injuries arising from the dangerous character of their work.

*Motion sustained.*
*New trial granted.*